UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

```
----------------------------------------------------------------- x
In re:                                             )
                                                   )    Chapter 11
RICHFIELD EQUITIES, L.L.C.,¹                        )    Case No. 12-33788
        a Michigan limited liability company,      )    Honorable Daniel S. Opperman
                                                   )
                    Debtor.                         )    Jointly Administered
----------------------------------------------------------------- x
```

**MOTION OF THE DEBTORS AND DEBTORS IN POSSESSION FOR ENTRY OF:**

**(I)**　　**A "SALE PROCEDURES ORDER" (A) APPROVING BIDDING PROCEDURES FOR THE SALE OF CERTAIN OF THE DEBTORS' ASSETS, (B) APPROVING CERTAIN BIDDING PROTECTIONS, (C) APPROVING THE FORM AND MANNER OF NOTICE OF THE BIDDING PROCEDURES HEARING, THE AUCTION AND THE SALE HEARING, (D) APPROVING THE FORM AND MANNER OF NOTICE OF THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (E) SCHEDULING AN AUCTION AND THE SALE HEARING; AND**

**(II)**　　**A "SALE APPROVAL ORDER" AUTHORIZING (A) THE SALE OF SUCH ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES, AND (B) THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**(Rizzo Contracts Sale)**

---

**Richfield Equities, L.L.C.** ("REQ"), **Richfield Landfill, Inc.** ("Landfill"),

**Richfield Management, L.L.C., Inc.** ("Management"), and **Waste Away Disposal, L.L.C.**

**f/k/a Richfield Capital, L.L.C.** ("Waste Away" and, together with REQ, Landfill and

Management, the "Debtors"), debtors and debtors-in-possession herein, by and through

---

¹ The Debtors in this jointly administered bankruptcy proceeding are: Richfield Equities, L.L.C., Case No. 12-33788; Richfield Landfill, Inc., Case No. 12-33789; Richfield Management, L.L.C., Inc., Case No. 12-33790; and Waste Away Disposal, L.L.C., Case No. 12-33791.

1

their counsel, Carson Fischer, P.L.C., hereby move the Court, pursuant to sections 105(a), 363(b), 365, and 503(b)(1) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and Rules 2002, 6004, 9007, and 9014 of the Federal Rules of Bankruptcy Procedures (the "<u>Bankruptcy Rules</u>"), for entry of an order in the form attached hereto as **Exhibit 1-A** (the "<u>Bidding Procedures Order</u>"):

    (a)    authorizing and approving the Bidding Procedures (as defined herein) for the sale of the Applicable Contracts (as defined herein);

    (b)    approving certain bidding protections;

    (c)    approving the form and manner of (i) notice of an auction (the "<u>Auction</u>") and a final sale hearing (the "<u>Sale Hearing</u>"), and (ii) notice of the assumption and assignment of executory contracts and unexpired leases, substantially in the form of **Exhibit 2** to the Bidding Procedures Order (the "<u>Sale Notice</u>"); and

    (d)    scheduling the Auction and the Sale Hearing.

The Debtors also hereby move the Court pursuant to section 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014, for entry of an order attached hereto as **Exhibit 1-B** (the "<u>Sale Order</u>"):

    (a)    authorizing and approving the sale of the Applicable Contracts (as defined below) to the Stalking Horse Bidder  (as defined below) or such other party that is the successful bidder at the Auction, free and clear of liens, claims and encumbrances;

(b)     authorizing and approving the assumption and assignment of executory

contracts and unexpired leases.

In support of this Motion, the Debtors respectfully state as follows:

<u>**JURISDICTION AND VENUE**</u>

1.      The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and

1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue is proper in this district

under 28 U.S.C. §§ 1408 and 1409.

<u>**BACKGROUND**</u>

2.      On September 18, 2012 (the "<u>Petition Date</u>"), the Debtors each filed a

voluntary petition for relief under title 11 of the United States Code, 11 U.S.C. §§ 101-

1531 (the "<u>Bankruptcy Code</u>").  The Debtors are continuing in possession of their

property and are operating and managing their businesses, as debtors-in-possession,

pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3.      The Office of the United States Trustee formed the official committee of

unsecured creditors on October 10, 2012 (the "<u>Committee</u>").  No trustee has been

appointed in the Bankruptcy 11 Cases.

*A.      DEBTORS AND THEIR BUSINESS*

4.      REQ is a limited liability company that directly owns 100% of the

ownership interests of each of Richfield Landfill, Inc., a corporation organized under

the laws of Michigan ("<u>Landfill</u>"), Richfield Management, L.L.C., a limited liability

company organized under the laws of Michigan ("<u>Management</u>"), and Waste Away

Disposal, L.L.C. f/k/a Richfield Capital, L.L.C., a limited liability company organized under the laws of Michigan ("Waste Away").[2]

5.     Debtors are a vertically-integrated solid waste collection, transfer, disposal, and recycling company that service the southeast, central/mid, and "thumb" regions of Michigan.

6.     The Debtors' core business provides for landfill operation and collection, transfer and disposal services for municipal solid waste ("MSW").[3]  In addition, Debtors offer commercial services to business establishments and institutions.

7.     The Debtors' operations include two (2) landfills, two (2) transfer stations, and collection and hauling operations.  The Debtors serve a diverse portfolio of residential, municipal, industrial, and commercial customers.

8.     The Debtors' vertical integration strategy allows the Debtors to control the waste stream from the point of collection through disposal, thereby increasing internalization[4] and profitability.

9.     Landfills generally offer attractive operating margins, and the ability to internalize waste creates a competitive advantage for the Debtors.  By internalizing

---

[2] Attached as Exhibit 1 to the *Affidavit of Bernhard Rumbold in Support of Chapter 11 Petitions and First Day Pleadings and Requests* [Docket No. 2] (the "First Day Affidavit") is an organizational chart that shows the relationship among the Debtors.

[3] MSW is non-hazardous and primarily generated by households and consists of everyday items such as product packaging, clothing, food scraps, paper, cardboard, and other non-hazardous refuse.

[4] Internalization is the act of disposing of waste collected by the Debtors at landfills owned by the Debtors.

waste, the Debtors avoid having to pay others for disposal. Instead, the disposal expense remains within the Debtors' operations, thereby increasing profits.

10. For the twelve months ending April 30, 2012, the Debtors recorded consolidated gross revenue of approximately 26.1 million and incurred net losses of approximately $2.5 million. The Debtors are projecting consolidated gross revenues of approximately $27.2 million for 2012. The Debtors' consolidated balance sheet shows that as of April 30, 2012, the Debtors had total assets of approximately $37.1 million and total liabilities of approximately $41.8 million.

11. As of the Petition Date, the Debtors utilize approximately 244 leased employees, comprised of 18 salaried, non-union employees, 36 hourly, non-union employees, and 190 hourly union employees. The Debtors' hourly employees at their hauling operations are represented by the International Brotherhood of Teamsters Local Nos. 332 and 337 (the "Union"). The Collective Bargaining Agreement between Management and the Union is scheduled to expire on February 25, 2014.

**B.     PRE-PETITION CREDIT FACILITY**

12. On or about March 29, 2007, REQ entered into a term loan facility and a revolving credit facility, which included the issuance of Letters of Credit utilized by the Debtors in the operation of their businesses, (as amended, supplemented or otherwise modified prior to the commencement of the Case 11 Cases, the "Prepetition Credit Facility", and together with all financing agreements and all other agreements and documents relating to the senior indebtedness and executed prior to the Petition Date, collectively, the "Prepetition Credit Documents")) with Comerica Bank ("Comerica").

13.     The obligations under the Prepetition Credit Documents are secured by a security interest in substantially all of the assets of the Debtors and were guaranteed by each of Landfill, Management, and Waste Away, as well as other non-debtor individuals and non-operating entities.

14.     As of the Petition Date, the total outstanding principal amount owed to Comerica, exclusive of certain additional accrued but unpaid interest, costs, fees and expenses, under the Prepetition Credit Documents was approximately $18 million plus contingent reimbursement obligations of approximately $8.3 million under applications for letters of credit issued by Bank (the "Prepetition Indebtedness").

## C.     EVENTS LEADING TO THE CHAPTER 11 FILING

15.     The filing of the Chapter 11 Cases has been brought about by several factors, which, when taken together, caused liquidity pressures for the Debtors.  The Debtors have had to contend with: (a) increased disposal expenses caused by record rainfall during the spring 2011 season which resulted in excess leachate[5] and excessive garbage (from flooded basements) and yard waste; (b) costs associated with disposal of recyclable materials; (c) increased fuel prices; and (d) capacity constraints at their landfills caused by insufficient or delayed funding for cell construction resulting in significant overtime and fuel expenses.

---

[5] Leachate is the liquid material collected from a landfill caused principally by precipitation percolating through waste deposited in the landfill.  The leachate generally contains both dissolved and suspended material.

## THE PROPOSED SALE

16.     For the approximately fifteen months prior to the Petition Date, the Debtors, with the assistance of their investment banker, have been engaged in a process to sell some or all of the Debtors' assets and/or business operations.

17.     The Debtors considered a number of potential sales and restructuring alternatives in order to develop a plan that would maximize value for its creditors and/or to ensure the long-term continuity of its business. In this regard, the Debtors' members and representatives engaged in discussions with numerous prospective parties, including, strategic partners, investors, and buyers, to determine their interest in pursuing a transaction with the Debtors.

18.     Due to significant liquidity concerns and in an effort to maximize the value of the Debtors' estates, the Debtors have determined, after the exercise of due diligence and in the exercise of the Debtors' sound business judgment, to enter into an Asset Purchase Agreement dated October 15, 2012 (the "APA") with Rizzo Environmental Services, Inc. (the "Stalking Horse Bidder") pursuant to which Stalking Horse Bidder has agreed to act as a stalking horse bidder for the sale of certain executory contracts for the collection, transfer and disposal of MSW (as identified and described in greater detail in the APA) (the "Applicable Contracts") free and clear of all liens, claims and encumbrances.

19.     The Debtors have determined that the floor established by the APA, subject to higher and better bids pursuant to a Court-approved, open auction process

7

pursuant to section 363 of the Bankruptcy Code (the "<u>Proposed Sale</u>"), affords them the best opportunity to maximize value for their creditors.

20. Among other provisions, the APA includes the following salient terms:

    a. The closing shall take place on or before November 9, 2012 (the "<u>Closing Date</u>").

    b. The purchase price (the "<u>Purchase Price</u>") for the Applicable Contracts will be $2,000,000, plus assumption of the Assumed Liabilities.

    c. Among other bid protections for the Stalking Horse Bidder, a break-up fee of $100,000 (the "<u>Break-Up Fee</u>") and expense reimbursement not to exceed $50,000 (the "<u>Expense Reimbursement</u>") is payable to Stalking Horse Bidder if a competing bid is approved by the Court and Debtors actually close a transaction with the party making such Court-approved competing bid.

    d. The Debtors are obligated to obtain entry of the Sale Order on or before **November 9, 2012**.

A copy of the APA is attached as **Exhibit 4**. [6]

## THE BIDDING PROCEDURES

21. The Debtors obviously desire to receive the greatest value for the Applicable Contracts. Although they believe that the APA is the result of exhaustive marketing efforts and is reasonable and reflects the highest and best value for the Applicable Contracts as of the date of this Motion, the Debtors nevertheless recognize the prudence of placing the APA to the test of the broader public marketplace in the

---

[6] While the Motion generally summarizes the APA, this summary is qualified, in its entirety, by the terms of the APA. To the extent there is a conflict between the terms of the APA and the description of those terms in the Motion, such conflict shall be resolved in favor of the APA and the terms of the APA shall be given full force and effect. Capitalized terms that are not defined in this Motion shall have the meaning set forth in the APA.

Chapter 11 Cases such that higher and better offers (a "<u>Superior Transaction</u>") might be generated for the Applicable Contracts. Accordingly, the Bidding Procedures were developed with the objective of promoting active bidding that will result in the highest and best offer the marketplace can sustain for the Applicable Contracts. At the same time, the Bidding Procedures reflect the Debtors' objective of conducting the Auction in a timely, controlled, and fair and open fashion that promotes interest in the Applicable Contracts by financially-capable, motivated bidders who are likely to close a transaction.

22.     The Debtors request that the Court approve the bidding procedures contained in **Exhibit 1** to the Bidding Procedures Order (the "<u>Bidding Procedures</u>").

23.     The Debtors believe that the Bidding Procedures provide an appropriate framework for selling the Applicable Contracts and will enable the Debtors to review, analyze and compare all bids received to determine which bid is in the best interests of the Debtors' estates and creditors.

<u>**PROPOSED BIDDING PROTECTIONS**</u>

24.     As part of the Bidding Procedures Order, the Debtors are also requesting approval of the provisions of the APA regarding the payment of the Break-Up Fee and Expense Reimbursement on the terms and conditions set forth in the APA. The Stalking Horse Bidder has indicated that it is not willing to serve as a stalking horse bidder without the inclusion and pre-approval of the Break-Up Fee and Expense Reimbursement.

25.     As contained in greater detail in the APA, if approved by this Court, the Debtors would be required to pay the Stalking Horse Bidder the Break-Up Fee and Expense Reimbursement if a competing bid is approved by an order of the Bankruptcy Court and the Debtors actually consummate and close a transaction with such competing bid.

26.     Approval of bid protections in connection with the sale of significant assets pursuant to section 363 of the Bankruptcy Code is an established practice in chapter 11 cases.  Bankruptcy courts have approved bidding incentives similar to the Break-Up Fee and Expense Reimbursement under the "business judgment rule," which proscribes judicial second-guessing of the actions of a company taken in good faith and in the exercise of honest judgment. See, e.g., In re Loral Space & Commc'ns Ltd., Case No. 03-41710 (RDD) (Bankr. S.D.N.Y. 2003) (approving break-up fee and expense reimbursement); In re Magellan Health Servs., Inc., Case No. 03-405115 (PCB) (Bankr. S.D.N.Y. 2003) (approving termination fee, commitment fee, and reimbursement of expenses); In re Integrated Res., Inc., 147 B.R. 650, 662 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993) (approving termination fee plus reimbursement of expenses); In re Marrose Corp., Case Nos. 89 B 12171 (CB) to 89 B 12179 (CB), 1992 WL 33848 at *5 (Bankr. S.D.N.Y. Feb. 15, 1992) (bidding incentives are "meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers."); In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may be "legitimately necessary to convince a white knight to

enter the bidding by providing some form of compensation for the risks it is undertaking.") (citation omitted).

27.     The Debtors submit that the proposed Break-Up Fee and Expense Reimbursement will not chill bidding, are reasonable, and will enable the Debtors to maximize the value of their estates.

28.     The APA establishes a legitimate price floor and initiates a legitimate sales process, allowing the Debtors to both maximize the value of their estates and evaluate properly other competing bids that may be materially higher or otherwise better than the Stalking Horse Bidder's bid reflected in the APA.

## PROPOSED SALE NOTICE

29.     Pursuant to Bankruptcy Rule 2002(a), absent an order of the Court shortening the time period, the Debtors are required to provide creditors with 21 days' notice of the Sale Hearing.   Pursuant to Bankruptcy Rule 2002(c), such notice must include the date, time, and place of the Auction and the Sale Hearing, and the deadline for filing any objections to the Proposed Sale.  The Debtors propose that the deadline for objecting to approval of the Proposed Sale shall be the Objection Deadline provided in the Bidding Procedures Order.  Within two (2) business days of entry of the Bidding Procedures Order, the Debtors will cause the Sale Notice, in a form substantially similar to the form attached as **Exhibit 2** to the Bidding Procedures Order, and the Bidding Procedures Order, to be sent by first class mail, postage-prepaid, to (i) those parties included on the Debtors' Court approved Special Service Matrix (which includes: (a) all secured creditors of Debtors, (b) the Committee, (c) all affected federal, state, and local

regulatory and taxing authorities, (d) the Office of the United States Trustee, and (e) all entities that have requested service in the Chapter 11 Cases); and (ii) all entities that have known or reasonably believed to have expressed an interest in acquiring the Applicable Contracts.

30. The Sale Notice shall indicate that this Motion and the APA can be obtained from counsel for the Debtors or from their Court approved noticing agent. In addition, the Debtors have served this Motion, including a copy of the APA, on those persons in category (i) above.

31. The Sale Notice will include, among other things, the date, time and place of the Auction and the Sale Hearing and the proposed deadline for filing any objections to the Proposed Sale, and, will therefore, comply with Bankruptcy Rule 2002(c). The Debtors submit that the methods of notice described herein comply with Bankruptcy Rule 2002 and constitute good and adequate notice of the Proposed Sale of the Applicable Contracts. Therefore, the Debtors respectfully request that this Court approve the notice procedures proposed above.

## EXECUTORY CONTRACTS AND LEASES

32. As part of the Proposed Sale, Debtors intend to assume and assign the Applicable Contracts. Within two (2) business days of entry of the Bidding Procedures Order, the Debtors will file a schedule of cure obligations (the "Cure Schedule") for the Applicable Contracts. The Cure Schedule will include a description of each of the Applicable Contracts potentially to be assumed and assigned under the APA or other asset purchase agreement with the Successful Bidder and the amount, if any, the

Debtors believe is necessary to cure the Applicable Contracts pursuant to section 365 of the Bankruptcy Code (the "Cure Costs"). A copy of the Cure Schedule will be attached as **Exhibit A** to the Sale Notice and served on each of the non-debtor parties listed on the Cure Schedule by first class mail on the date that the Cure Schedule is filed with the Court. Any objections to the assumption and assignment of any Applicable Contracts identified on the Cure Schedule, including, but not limited to, objections relating to adequate assurance of future performance or to the Cure Costs set forth on such schedule, must be in writing, filed with the Court, and be actually received on or before the date provided in the Sale Notice (the "Assumption/Assignment Objection Deadline") by the parties identified therein; provided, however, that in the event the Auction results in a Successful Bidder other than the Stalker Horse Bidder, the deadline for objecting to the assignment of the Applicable Contracts to such Successful Bidder on the basis of adequate assurance of future performance will be the commencement of the Sale Hearing. Any objection to the Cure Costs shall set forth the specific default or defaults in any Applicable Contracts and set forth the specific monetary amount that differs from the amount (if any) specified by the Debtors in the Cure Schedule.

33. If no objections are received, then the Cure Costs set forth in the Cure Schedule will be binding upon the non-debtor parties to the Applicable Contracts for all purposes in these chapter 11 cases and otherwise, and will constitute a final determination of the total Cure Costs required to be paid in connection with the assumption and assignment of the Applicable Contracts. In addition, all counterparties to the Applicable Contracts will (a) be forever barred from objecting to the Cure Costs

and from asserting any additional cure or other amounts with respect to the Applicable Contracts, and the Debtors and the Stalking Horse Bidder, or other Successful Bidder at the Auction, will be entitled to rely solely upon the Cure Costs set forth in the Cure Schedule, (b) be deemed to have consented to the assumption and assignment, and (c) be forever barred and estopped from asserting or claiming against the Debtors or the Stalking Horse Bidder, or other Successful Bidder at the Auction, that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied under such Applicable Contracts or that there is any objection or defense to the assumption and assignment of such Applicable Contracts.

34.     Where a non-debtor counterparty to an Applicable Contracts files an objection asserting a cure amount higher than the proposed Cure Costs (the "Disputed Cure Costs"), then (a) to the extent that the parties are able to consensually resolve the Disputed Cure Costs prior to the Sale Hearing, the Debtors shall promptly provide Comerica Bank, the Committee, if any, the United States Trustee and Stalking Horse Bidder, notice and an opportunity to object to such proposed resolution or (b) to the extent the parties are unable to consensually resolve the dispute prior to the Sale Hearing, then the amount to be paid under section 365 of the Bankruptcy Code with respect to such Disputed Cure Costs will be determined at the Sale Hearing. All other objections to the proposed assumption and assignment of an Applicable Contracts will be heard at the Sale Hearing. The Debtors intend to cooperate with counterparties to Applicable Contracts to attempt to reconcile any differences in a particular cure amount.

35.     Except to the extent otherwise provided in the APA, the Debtors shall be relieved of all liability accruing or arising after the assumption and assignment of the Applicable Contracts pursuant to section 365(k) of the Bankruptcy Code.

36.     The Debtors request that any party failing to object to the proposed transactions be deemed to consent to the treatment of its executory contract and/or unexpired lease under section 365 of the Bankruptcy Code. See In re Tabone, Inc., 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); In re Gabeel, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same). Moreover, the Debtors request that each such party be deemed to consent to the assumption and assignment of its executory contract and/or unexpired lease notwithstanding any anti-alienation provision or other restriction on assignment. See 11 U.S.C. §§ 365(c)(1)(B), (e)(2)(A)(ii), and (f).

## BASIS FOR RELIEF

**A.     The Bidding Procedures Are Appropriate And Will Maximize The Value Received For The Applicable Contracts.**

37.     Section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  As described above, approval of the Bidding Procedures will greatly assist the Debtors in maximizing the value that they may obtain for the Applicable Contracts. Consequently, the Debtors respectfully submit that granting the requested relief is "appropriate" under the circumstance.

38.     Once the Debtors articulate a valid business justification, "[t]he business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." In re S.N.A. Nut Company, 186 B.R. 98 (Bankr. N.D. Ill. 1995)(internal quotation, citation omitted); In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992); In re Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions.").

39.     Indeed, when applying the "business judgment" rule, courts show great deference to the debtor's decision-making. See Summit Land Co. v. Allen (In re Summit Land Co.), 13 B.R. 310, 315 (Bankr. D. Utah 1981). Thus, this Court should grant the relief requested in this Motion if the Debtors demonstrate a sound business justification therefor. See Schipper, 933 F.2d at 515; In re Lionel Com., 722 F.2d at 1071; In re Delaware Hudson Ry. Co., 124 B.R. 169 at 179.

40.     The Bidding Procedures are designed to encourage competitive bidding in an orderly manner to maximize value for the Debtors' estates for their creditors. The proposed procedures contain terms typical for a process through which a sale of this nature is consummated, and the adoption of the Bidding Procedures represents a sound exercise of the Debtors' business judgment.

41.     The Debtors believe it is in the best interests of their estates and creditors to commence an auction process immediately, as the Debtors have very limited funding and resources, to try to maximize the value of their assets for all stakeholders.

42.     For these reasons, the Debtors have determined, based upon their business judgment, that the best option for maximizing the value of their estates for the benefit of creditors and other parties in interest is through a sale of the Applicable Contracts pursuant to the Bidding Procedures.

43.     The Bidding Procedures are designed to encourage competitive bidding. The Stalking Horse Bidder's bid will serve as a floor for other bids and will induce other bids that otherwise would not have been made. As such, the Bidding Procedures will provide a benefit to the Debtors' estates.

44.     The minimum overbid requirements described in the Bidding Procedures are appropriate under the circumstances as well. They are rather modest minimum overbid requirements given the size of this transaction, and the Debtors believe that it is unlikely that they will deter a serious competing bidder.

45.     Accordingly, the Debtors request that the Court approve the Bidding Procedures.

**B.      The APA And Proposed Sale Have A Sound Business Justification, Were And Will Be Arm's-Length Transactions, And Will Maximize The Return For Creditors.**

46.     The relief requested by this Motion is appropriate and within the Court's authority to approve transactions under section 363(b) of the Bankruptcy Code and within the Court's equitable powers under section 105(a) of the Bankruptcy Code.

47.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section

363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the disposition of a debtor's assets prior to confirmation of a plan. However, bankruptcy courts have required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the debtors. See In re Abbotts Dairies of Pa., Inc., 788 F.2d 143 (3d Cir. 1986); see also Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991).

48.     A court has the statutory authority to authorize a debtor to use property of the estate pursuant to section 363(b)(1) of the Code when such use is in the debtor's sound business judgment and when the use of the property is proposed in good faith. See Stephen Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986) (utilizing the "sound business purpose" standard for sales proposed under section 363(b)(1)); see also In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999); In re Lionel Corp., 722 F.2d 1063, 1070 (2d Cir. 1983).

49.     In addition, the relief requested by this Motion is appropriate and within the Court's equitable powers under section 105(a) of the Bankruptcy Code. Section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under title 11. Section 105(a) provides that "[t]he court may

issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [title 11]." 11 U.S.C. § 105(a).

50. Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper. See In re Fesco Plastics Corp., 996 F.2d 152, 154 (7th Cir. 1993); Pincus v. Graduate Loan Ctr. (In re Pincus), 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. See, e.g., Chinichian v. Campolongo (In re Chinichian), 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); In re Cooper Props. Liq. Trust, Inc., 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws").

51. A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." In re Baldwin United Corp., 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).

52. Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. Lionel, 722 F.2d at 1071; see also Montgomery Ward, 242 B.R. at 155.

53.     The Debtors submit that ample business justification exists to sell the Applicable Contracts to the Stalking Horse Bidder or any other Successful Bidder pursuant to the terms of the Bidding Procedures Order.  The Debtors have carefully considered and analyzed the Stalking Horse Bidder's offer as set forth in the APA, and in light of the circumstances described herein, have concluded that a sale of the Applicable Contracts is in the best interests of their estates and will maximize the value of the Debtors' estates for the benefit of all stakeholders.  Thus a sound business purpose justifies the sale of the Applicable Contracts.  The Debtors have limited access to cash to fund their operations and believe that a prompt sale is vital to preserving any potential "going concern" value of the Applicable Contracts and to maximize recovery to creditors and other parties in interest.  Thus, the Proposed Sale presents the best opportunity to realize value for the Debtors' creditors.  As described above, the Debtors have already extensively marketed the Applicable Contracts to potential bidders, and there will be sufficient time and opportunity for potential qualified bidders to submit overbids.  The Debtors, in the exercise of their business judgment, and in consultation with their professionals, believe that the Proposed Sale to the Stalking Horse Bidder, or any other Successful Bidder, will constitute the highest and best offer for the Applicable Contracts.

54.     The sale of the Applicable Contracts will be in exchange for fair and reasonable value.  Pursuant to the APA, the Stalking Horse Bidder has agreed to provide the previously described consideration for the Applicable Contracts. The Debtors submit that this constitutes significant consideration for the Applicable

Contracts, and the Proposed Sale is further subject to an open market process through the solicitation of competing bids in the Court-supervised Auction. Pursuant to the Bidding Procedures Order, all potentially interested bidders will receive adequate and reasonable notice of the opportunity to submit a competing bid prior to the Auction, and the Bidding Procedures will facilitate an open and competitive bidding process in which all parties will participate in good faith.

55. Moreover, the APA was the product of good faith, arm's length negotiations between the Debtors, on the one hand, and the Stalking Horse Bidder, on the other, and was negotiated with the active involvement of the Debtors' representatives. The Stalking Horse Bidder is a Delaware corporation that is not related to the Debtors in any way.

56. The Debtors believe and therefore submit that the Proposed Sale of the Applicable Contracts to the Stalking Horse Bidder pursuant to the APA is not the product of collusion or bad faith. The Stalking Horse Bidder does not share common ownership with the Debtors, and is independently controlled and operated. For these reasons, the Proposed Sale satisfies the good faith element of the "sound business purpose" test. See Abbotts Dairies, 788 F.2d at 147-48 ("Typically, the misconduct that would destroy a stalking horse bidder 's good faith status at a judicial sale involves fraud, collusion between the stalking horse bidder and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.").

## C. The Proposed Sale Satisfies The Requirements Of Section 363(f) Of The Bankruptcy Code

57.     The Debtors further submit that it is appropriate to sell the Applicable Contracts free and clear of liens pursuant to section 363(f) of the Bankruptcy Code, with any such liens attaching to the proceeds of the Proposed Sale of the Applicable Contracts to the extent applicable.

58.     Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell all or any part of its property free and clear of any and all liens, claims or interests in such property if (a) such a sale is permitted under applicable non-bankruptcy law; (b) the party asserting such a lien, claim or interest consents to such sale; (c) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the party asserting the lien, claim or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest. <u>See</u> 11 U.S.C. § 363(f); <u>Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)</u>, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that section 363(f) is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met). The Debtors expects that they will satisfy the requirements of section 363(f) of the Bankruptcy Code.

59.     Furthermore, courts have held that they have the equitable power to authorize sales free and clear of interests that are not specifically covered by section 363(f). <u>See, e.g.</u>, <u>In re Trans World Airlines, Inc.</u>, 2001 WL 1820325 at *3, 6 (Bankr. D. Del. March 27, 2001) (explaining that "courts have long had the authority to authorize the sale of estate assets free and clear even in the absence of §363(f)"); <u>Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)</u>, 75 B.R. 944, 948

(Bankr. N.D. Ohio 1987) (authorizing sale free and clear of tort claims even if such claims are not covered specifically by the provisions of §363(f)).  As the Trans World Airlines court explained, "[t]he authority to sell free and clear is broad. It reflects a compelling policy to encourage bankruptcy sales subject only to claims of a specific and recognized nature in the subject property." Trans World, 2001 WL 1820325, at *3.  Thus, even in the case of general unsecured claimants, including tort claimants, who arguably have no specific interest in a debtor's property (and, therefore, section 363 of the Bankruptcy Code would not be applicable to such claims), courts have held that the authority to conduct sales free and clear of such claims is still within their equitable powers.  White Motor Credit., 75 B.R. at 948.

60.     A sale of the Applicable Contracts other than one free and clear of encumbrances would have a material adverse impact on the Debtors' bankruptcy estates and would yield substantially less value for the Debtors' estates with less certainty than the Proposed Sale.  The Stalking Horse Bidder would not have entered into the APA if the purchase of the Applicable Contracts would not be free and clear of encumbrances as contained in the proposed Sale Order.  The Debtors believe that one or more of the tests of section 363(f) are satisfied with respect to the transfer of the Applicable Contracts pursuant to the APA.  Moreover, the Debtors believe that at least section 363(f)(2) will be met in connection with the transactions proposed under the APA because each of the parties holding liens on the Applicable Contracts will consent, or, absent any objection to this Motion, will be deemed to have consented to the Proposed Sale.  Additionally, any lienholder will be adequately protected by having

their liens, if any, attach to the proceeds of the Proposed Sale in the same order of priority, with the same validity, force and effect that such creditor had prior to the Proposed Sale, subject to any claims and defenses the Debtors may possess with respect thereto. Therefore, the Proposed Sale should be approved free and clear of encumbrances, as being in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

**D.      The Assumption and Assignment of the Applicable Contracts Should be Approved.**

61.      By this Motion, the Debtors also seek an order, pursuant to sections 365(a) and (f) of the Bankruptcy Code, authorizing the Debtors to assume and assign the Applicable Contracts.  Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executor contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. See, e.g., In re Stable Mews Assoc., Inc., 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984). If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract. See Group of Institutional Investors v. Chicago M. St. P. & P.R.R. Co., 318 U.S. 523 (1943) (applying Bankruptcy Act section 77 subsection (b), the predecessor to Bankruptcy Code section 365); Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 39-40 (3d Cir. 1989). The business judgment

test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." In re Wheeling-Pittsburgh Steel Corp., 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting Stable Mews Assoc., 41 B.R. at 596). Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate and threaten the court's ability to control a case impartially. See Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985). Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

62.     Once an executory contract or unexpired lease is assumed, the trustee or debtor in possession may elect to assign such contract. See In re Rickel Home Ctrs., Inc., 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); see also In re Headquarters Dodge, Inc., 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of section 365(f) is to assist trustee in realizing the full value of the debtor's assets).

63.     Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract … only if the trustee assumes such contract … and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." See

In re Carlisle Homes, Inc., 103 B.R. 524, 538 (Bankr. D.N.J. 1989); see also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. Accord In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

64. Here, the Applicable Contracts being assumed and assigned to the Stalking Horse Bidder or any other Successful Bidder, will enhance the value of the Debtors' estates and is therefore reasonable.

65. The Debtors respectfully submit that the proposed assumption and assignment and sale of the Applicable Contracts pursuant to the terms of the assignment procedures are appropriate and reasonably tailored to provide the non-debtor parties to the Applicable Contracts with adequate notice of the proposed assumption and assignment of their applicable contract or lease, the proposed Cure Costs and the proposed assignee. Additionally, the Debtors believe that they can and will demonstrate that all requirements for assumption and assignment of the Applicable Contracts will be satisfied at the Sale Hearing. The Debtors will provide all non-debtor counterparties to the Applicable Contracts an opportunity to be heard. Moreover, the Debtors, as required by the Bidding Procedures Order, will also evaluate

the financial wherewithal of all potential bidders before qualifying such bidders to bid for the Applicable Contracts. For the reasons stated throughout this Motion, the Debtors, in exercising their sound business judgment, believe that assuming and assigning and selling the Applicable Contracts to the Stalking Horse Bidder or any other Successful Bidder, as the case may be, is in the best interests of their estates. Thus, the Debtors respectfully submit that by the conclusion of the Sale Hearing, assumption and assignment and sale of the Applicable Contracts should be approved under applicable bankruptcy law.

**E.      The Sale Of The Applicable Contracts Is Proposed In "Good Faith" Under Section 363(m) Of The Bankruptcy Code.**

66.      The Debtors additionally request that the Court find that the Stalking Horse Bidder or any other Successful Bidder, as the case may be, is entitled to the protections provided by section 363(m) of the Bankruptcy Code in connection with the Proposed Sale.  Section 363(m) of the Bankruptcy Code provides, in pertinent part: "The reversal or modification on appeal of an authorization under subsection (b) . . . of this section of a sale . . . of property does not affect the validity of a sale . . . under such authorization to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal." 11 U.S.C. § 363(m).

67.      Section 363(m) thus protects the Stalking Horse Bidder of assets sold pursuant to section 363 from the risk that it will lose its interest in the Applicable Contracts if the order allowing the sale is reversed on appeal.

68.     Although the Bankruptcy Code does not define "good faith stalking horse bidder ," courts have found that "the phrase encompasses one who purchases in 'good faith' and for 'value'." In re Abbotts Dairies of Penn, Inc., 788 F.2d 173, 147 (3d Cir. 1986)). To constitute lack of good faith, a party's conduct in connection with the sale must usually amount to "fraud, collusion between the stalking horse bidder and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders." Id. (citing In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)); see also In re Bedford Springs Hotel, Inc., 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); In re Perona Bros., Inc., 186 B.R. 833, 839 (D.N.J. 1995). Due to the absence of a bright line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings." In re Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting Rock Indus. Machinery Corp., 572 F.2d at 1198 (7th Cir. 1978)).

69.     As required by section 363(m) of the Bankruptcy Code, both the Debtors and the Stalking Horse Bidder have acted in good faith in negotiating the sale of the Applicable Contracts.  There is no evidence of fraud or collusion in the terms of the Proposed Sale.  To the contrary, as discussed throughout this Motion, the Proposed Sale will be the culmination of a lengthy solicitation and negotiation process.  The Stalking Horse Bidder is not, nor would any other Successful Bidder likely be, an insider of the Debtors as that term is defined in section 101(31) of the Bankruptcy Code, and all negotiations have been and will continue to be conducted on an arms-length, good faith basis.  The Bidding Procedures are designed to ensure that no party is able to exert

undue influence over the process. Furthermore, the Bidding Procedures are designed to prevent the Debtors, the Stalking Horse Bidder or any other Successful Bidder from engaging in any conduct that would cause or permit the Proposed Sale to be avoided, or costs or damages to be imposed under, section 363(n) of the Bankruptcy Code.

70. All parties in interest will receive notice of the Proposed Sale and will be provided an opportunity to be heard. The Debtors submit that such notice is adequate for entry of the Sale Order and satisfies the requisite notice provisions required under section 363(b) of the Bankruptcy Code. Under the circumstances, the Stalking Horse Bidder or any other Successful Bidder, as the case may be, should be afforded the benefits and protections that section 363(m) of the Bankruptcy Code provides to a good faith Stalking Horse Bidder .

**F.**    **Relief From The Fourteen Day Waiting Periods Under Bankruptcy Rules 6004(h) And 6006(d) Is Appropriate.**

71. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." The Debtors request that the Sale Order be effective immediately by providing that the fourteen (14) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

72.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. <u>See</u> Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen (14) day stay period, Collier on Bankruptcy suggests that the fourteen (14) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 COLLIER ON BANKRUPTCY 15th Ed. Rev., ¶6064.09 (L. King, 15th rev. ed. 1988).  Furthermore, Collier on Bankruptcy provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. <u>Id</u>.

73.     The Debtors hereby request that the Court waive the fourteen (14) day stay period under Bankruptcy Rules 6004(h) and 6006(d).

74.     All parties in interest will receive notice of the Proposed Sale or a competing transaction and will be provided with an opportunity to be heard.  The Debtors submit that such notice is adequate for entry of the order approving this Motion and waiving the fourteen (14) day waiting periods under Bankruptcy Rules 6004(h) and 6006(d).

## <u>NOTICE</u>

75.     Notice of this Motion has been provided to those parties included on the Debtors' Court approved Special Service Matrix (which includes: (a) all secured

creditors of Debtors, (b) the Committee, (c) all affected federal, state, and local regulatory and taxing authorities, (d) the Office of the United States Trustee, and (e) all entities that have requested service in the Chapter 11 Cases.  Additional notice of the Auction, Sale Hearing and proposed Cure Schedule will be provided as contained herein.  Due to the urgency of the circumstances surrounding this Motion and the nature of the relief herein, the Debtors respectfully submit that no further notice of this Motion is required.  In order to comply with the requirements of the APA, this Sale Motion has been submitted on an expedited basis.

**WHEREFORE**, the Debtors respectfully request the Court grant the relief requested in this Sale Motion substantially in the form attached as **Exhibit 1-A (**with regard to the Bidding Procedures Order) and **Exhibit 1-B (**with regard to the Sale Order), and such other and further relief as is just and proper.

October 15, 2012

**CARSON FISCHER, P.L.C.**

*/s/ Christopher A. Grosman*
Joseph M. Fischer (P13452)
Robert A. Weisberg (P26698)
Christopher A. Grosman (P58693)
4111 Andover Road
West - Second Floor
Bloomfield Hills, Michigan  48302
Telephone:  (248) 644-4840
Facsimile: (248) 644-1832
E-mail:  JFischer@CarsonFischer.com
RWeisberg@CarsonFischer.com
CGrosman@CarsonFischer.com

*Counsel for the Debtors*

## INDEX OF EXHIBITS

Exhibit A-1     -     *Proposed* Bidding Procedures Order

Exhibit A-2     -     *Proposed* Sale Order

Exhibit 2     -     Notice and Opportunity to Object

Exhibit 3     -     Certificate of Service

Exhibit 4     -     Asset Purchase Agreement